UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                :

UNITED STATES OF AMERICA,          :

        – against –          :

SCOTT BECKER,            :

           Defendant.    :

                :

                :

                :

------------------------------------------------------------- x

Case No.: 22 Cr. 231 (LTS)


**SENTENCING MEMORANDUM ON BEHALF OF SCOTT BECKER**


**COHEN & GRESSER LLP**

Jason Brown
Randall W. Bryer
800 Third Avenue
New York, NY 10022
Tel: (212) 957-7600
jbrown@cohengresser.com

*Attorneys for Scott Becker*

# TABLE OF CONTENTS

I.      Preliminary Statement .................................................................................................. 1

II.     Scott's Personal and Family History ........................................................................... 2

    A.      Childhood ............................................................................................................ 2

    B.      Education and Early Professional Life ................................................................ 4

        1.      College ..................................................................................................... 4

        2.      Early Career ............................................................................................. 5

    C.      Employment at Tiger Asia and Archegos ........................................................... 6

    D.      Scott Becomes a Husband and Father, and Builds a Life in Goshen, NY ........... 10

III.    The Offense Conduct .................................................................................................. 16

    A.      Mr. Halligan Trained Scott to Lie ...................................................................... 16

    B.      Scott Lied in Furtherance of Archegos's Trading Strategy ................................. 17

    C.      Archegos Collapses ........................................................................................... 20

IV.     Scott Accepts Responsibility and Cooperates ............................................................ 21

    A.      Scott's Pre-Trial Cooperation ............................................................................ 21

    B.      Scott Cooperates and Reaches Resolutions with the SEC and CFTC ................. 23

    C.      Scott's Trial Testimony ...................................................................................... 23

    D.      Scott's Efforts to Rebuild His Life .................................................................... 24

V.      The Sentencing Guidelines and the Probation and Pretrial Services Office's
Recommendation ........................................................................................................ 29

VI.     A Non-Custodial Sentence is Sufficient to Comply with Section 3553(a) ...................... 31

VII.    Conclusion ................................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In the Matter of Scott Becker*,
  CFTC No. 22–14 (Apr. 27, 2022)............................................................................23

*SEC v. Hwang, et al.*,
  No. 22-CV-3402 (JPO) (S.D.N.Y. May 4, 2022) ...................................................23

*United States v. Cotellessa-Pitz*,
  No. 10 Cr. 228 (LTS) (S.D.N.Y. May 27, 2015)......................................................34

*United States v. Fogel*,
  No. 17 Cr. 308 (LAK) (S.D.N.Y. Nov. 27, 2018) ...................................................36

*United States v. Friehling*,
  No. 09 Cr. 700 (LTS) (S.D.N.Y. June 4, 2015).......................................................34

*United States v. Gassnola*,
  No. 18 Cr. 252 (LAK) (S.D.N.Y. Sept. 10, 2019) ...................................................35

*United States v. Glass*,
  No. 07 Cr. 159 (LAK) (S.D.N.Y. Dec. 8, 2008).......................................................36

*United States v. Horowitz*,
  No. 19 Cr. 861 (ER) (S.D.N.Y. Nov. 16, 2023) ................................................35, 36

*United States v. Kumar*,
  No. 10 Cr. 13-01 (DC) (S.D.N.Y. July 2, 2012) ......................................................35

*United States v. Lipkin*,
  No. 10 Cr. 228 (LTS) (S.D.N.Y. May 27, 2015)......................................................34

*United States v. Eric Rohr*,
  No. 19 Cr. 595 (RA) (S.D.N.Y. May 11, 2023)........................................................36

*United States v. Singh*,
  No. 22 Cr. 673 (LAK) (S.D.N.Y. Oct. 30, 2024) ...............................................35, 36

*United States v. Tzvetkoff*,
  No. 10 Cr. 336 (LAK) (S.D.N.Y. June 4, 2014).......................................................35

*United States v. Wang*,
  No. 22 Cr. 673 (LAK) (S.D.N.Y. Nov. 20, 2024) ...................................................35

**Statutes**

18 U.S.C. § 3553(a) ............................................................................................29, 30, 31

U.S.S.G. § 3B1.2 cmt. n.3(C) ...........................................................................................34

U.S.S.G. § 5K1.1 ............................................................................................... *passim*

We submit this memorandum on behalf of Scott Becker, who is scheduled to be sentenced by this Court on September 3, 2025 at 11:00 a.m. On April 21, 2022, Scott pleaded guilty to a three-count criminal Information in connection with his employment at Archegos Capital Management. Scott is profoundly remorseful and has taken extraordinary steps to assist the government in its investigation and prosecution of these crimes. For the reasons set forth below, we respectfully request that Scott receive a non-custodial sentence.

## I.    Preliminary Statement

Since the summer of 2021, Scott has cooperated fully with the government's investigation and ensuing prosecutions arising from the collapse of Archegos. From the moment he was approached by the government, Scott committed to being completely truthful and assisting the government in any way possible. Scott has more than lived up to that commitment, meeting with the government over 30 times, each meeting lasting several hours. That cooperation culminated in a full week of trial testimony and was critical to the convictions of Bill Hwang and Patrick Halligan. As a result of Scott's unflinching and robust cooperation, the Presentence Investigation Report recommends that Scott receive a sentence of time served pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines.

While Scott has never once denied his criminal guilt for lying to banks, his role as Mr. Halligan's back-office subordinate was distinct from any involvement in developing Archegos's trading strategy. As the government recognized in agreeing post-trial to an eight-year sentence for Mr. Halligan, as opposed to the 18 years received by Mr. Hwang, this back-office role warrants a certain level of leniency, even without considering Scott's extraordinary and unflinching cooperation.

As reflected in the Presentence Report and the numerous letters from family and friends accompanying this submission, the conduct for which Scott is being sentenced is a profound

aberration from the rest of his life. A devoted husband, father, and friend, Scott has never before—and never will again—engage in any criminal activity.

Scott has already paid an enormous price for his misconduct. Unemployed, with limited financial resources, carrying the stigma of being a felon, and no longer licensed as a Certified Public Accountant, Scott's prospects for supporting his family are severely hampered. Moreover, the shame of his crimes will remain with him the rest of his life.

Scott is acutely mindful of the harm he has helped to cause and is deeply remorseful. In light of his efforts to rectify that harm by fully embracing cooperation with the government, a non-custodial sentence is appropriate.

## II.     Scott's Personal and Family History

### A.     Childhood

Scott was born on August 16, 1983 in Goshen, New York to Angela and Vincent "Vinnie" Becker. Scott's dad spent his career working as an electrician. His mom was a stay-at-home parent until Scott turned twelve, at which point she returned to work part-time in a school cafeteria and then became a teacher's aide. Presentence Investigation Report ("PSR") ¶¶ 139, 140. Scott is the eldest of three children raised in a loving, lower-middle-class family.

From a very early age, Scott's parents instilled in him a deep commitment to family and community. Ex. 1 (J. Becker). Growing up, Scott looked out for his siblings. Despite their age gap, Scott always invited his younger brother to play with him and his closest neighborhood friends, whether they were building forts, playing pickup games in the street, or going on bike rides. Ex. 1 (J. Becker). Scott would also "always make sure his little sister was safe, and that no one was bullying [her]." Ex. 2 (M. Becker-O'Connell). His little sister would share before family dinners that she loved her older brother because of how smart he was, because he helped

her with her math homework, and because he was kind to others and those in need.  Ex. 2 (M. Becker-O'Connell).

Although his family provided a loving refuge, the neighborhood in which Scott grew up presented him with difficulties and challenges as he reached adolescence.  Around the age of twelve, Scott's closest neighborhood friends started to get in trouble and experiment with drugs and alcohol.  Rather than joining them, Scott began to withdraw from his former friend group and increasingly focused on quiet studies by himself.  Ex. 3 (V. Becker).  As a result, Scott was teased, both by children and by adults in the neighborhood.  Ex. 3 (V. Becker).  Concerned for their son, his parents initially encouraged him to be more social.  Ex. 3 (V. Becker).  But they ultimately realized that Scott's behavior was self-protective.  As the years went by, Scott's childhood friends' struggles with addiction deepened, and they began dropping out of high school.  One of these childhood friends would later pass away from a drug overdose.  Ex. 3 (V. Becker).  His playmates' paths had profound impacts on Scott and instilled in him a deep empathy for those with different life experiences and different backgrounds.  Ex. 3 (V. Becker).

This empathy and compassion for others has been evident throughout Scott's life.  When he was in high school, the local paper ran a story about a "strapping yet gentle 16-year-old from Port Jervis" who volunteered at the Florida Agri-Business Child Development Migrant Head Start ("FABCD"), an organization that supported children of seasonal agricultural workers in the Port Jervis area.  *See* Ex. 4 (Tom Leek, *Florida: Churches, BOCES classes and a Port Jervis teenager personify the spirit of the season*, The Times Herald-Record.)  Scott got involved at the suggestion of his grandmother—an employee at FABCD—and spent part of a summer volunteering and "helping the toddlers at play, nap and teeth-brushing time." *Id*.  When the holidays approached, Scott was moved by the fact that these families had so little.  He

"coordinated a toy drive that netted 52 gifts for 20 Head Start kids and their siblings, and a pile of cash that helped buy necessities—warm coats—for the families, most of whom are from Mexico." Scott "wrote a letter to area businesses soliciting gifts, matched gifts against wish lists provided by moms and dads, and wrapped and labeled all the presents." *Id*. At the time, the Director of the Head Start program said that Scott's work was not only bringing joy and essentials to the children but breaking down barriers and building bridges of understanding between people from different backgrounds. *See* Ex. 4 (Leek, *supra*); Ex. 5 (A. Becker). Scott has carried this spirit of generosity and compassion throughout his life.

### B. Education and Early Professional Life

#### 1. College

Although he was a bright student and worked hard, Scott's path to higher education was not always clear. When Scott expressed hope of applying to a four-year college, his high school guidance counselor told him it was too ambitious a goal and suggested that he first attend the local community college. *See* Ex. 3 (V. Becker). Disappointed but undeterred, Scott redoubled his efforts, and he graduated among the top students in his class. He ultimately gained admission to all of the schools to which he applied. Ex. 3 (V. Becker).

In fall 2001, Scott matriculated at Manhattan College. *See* Ex. 3 (V. Becker). At the time, he was the first and only person in his family to pursue a college education. In an effort not to burden his family with the cost of this education, Scott applied for scholarships, took on part-time jobs, and took out loans. *See* Ex. 5 (A. Becker). He checked IDs at the college gym, was the secretary for the college ROTC office, and interned at the Bronx Veteran's Administration Hospital. *See* Ex. 6 (C. Scala); Ex. 7 (J. Iarocci). Scott's college roommates viewed him as a role model for how to handle the financial responsibilities of education. Ex. 6 (C. Scala) ("Scott was a role model for how he took care of his education expenses as well. Coming from humble

beginnings, to cover his expenses he took on student loans and worked after classes and during

school breaks at several jobs including at the Bronx Veteran's Administration hospital.").

As he did in high school, Scott committed himself to his studies at Manhattan College.

He was the "quiet upstate New York kid" who was a "consummate professional, with a near 4.0

GPA." Ex. 6 (C. Scala). Scott and his friends bonded over their "studious nature[s] and []

shared view of using college as a way to provide a better life for [themselves] and [their] future

families." Ex. 7 (J. Iarocci). They would spend hours studying together and considered "doing

well in school [] the most important job [they] had." Ex. 7 (J. Iarocci). Scott's hard work

ultimately paid off: he graduated with a double major in accounting and finance and was the top

student in his class. Trial Tr. 805:24–25; Ex. 5 (A. Becker). His parents proudly watched as

their son, a first-generation college graduate, received academic awards and was inducted into

numerous honors societies. Ex. 5 (A. Becker).

Even while juggling his financial and academic responsibilities, Scott remained

committed to his friends and family. His steady influence and dependable nature rendered Scott

the one they turned to "for advice and positive encouragement in all aspects of life." Ex. 6 (C.

Scala). "[W]hile others in [the] group were out partying, Scott was the one who was looking out

for everyone, making sure they got home safe." Ex. 7 (J. Iarocci); Ex. 6 (C. Scala) ("Scott was

the constant positive influence on myself and our other roommates."). "Scott also showed a

commitment to those whom he cared about, returning home as often as he could to visit family

and high school friends to maintain those relationships that were important to him." Ex. 7 (J.

Iarocci); *see also* Ex. 5 (A. Becker).

2.    Early Career

During the summer of his junior year, Scott secured a college internship at Tiger

Management LLC. Trial Tr. 806:23–807:4. At its peak, Tiger Management was one of the

5

largest hedge funds in the world, but by the early 2000s, it focused primarily on investing in a "new generation" of hedge funds, many of which were run by former Tiger Management employees. Trial Tr. 806:23–807:4. Because of their affiliation with Tiger Management, these new funds were colloquially referred to as "Tiger Cubs." Trial Tr. 806:23–807:4; 807:22–25. Scott worked at Tiger Management full-time during the summer of 2004. When he was offered the opportunity to extend the internship during the school year and work approximately 20 hours a week on top of his full-time class schedule, Scott gladly accepted in order to ensure he had income during the year.

It was during this internship that Scott first crossed paths with Bill Hwang and Patrick Halligan, senior individuals who would later become his bosses at Archegos. Trial Tr. 806:19–23. At the time, Bill Hwang was the founder of Tiger Asia, a Tiger Cub that principally invested in Asian securities. Trial Tr. 808:7–15. Scott met Mr. Halligan, then a fund accountant at Tiger Management, when he was transferred to a cubicle adjacent to where Mr. Halligan sat. Mr. Halligan would later become Chief Financial Officer at Tiger Asia. Trial Tr. 806:14–15.

 After observing Scott for several months, Mr. Halligan offered Scott a full-time job at Tiger Asia upon his graduation. Scott declined the offer. PSR ¶ 167. As a top soon-to-be graduate of his college's accounting and business program, Scott's goal was to join one of the Big Four. He achieved that goal and, shortly after graduating college, Scott was hired at Ernst & Young ("EY") as a full-time accountant. In that role, he audited the financial statements of financial services companies. Trial Tr. 806:1–5.

### C.    Employment at Tiger Asia and Archegos

After a few years working at EY, Scott realized that the job was not what he hoped it would be. When he entered the job market, he contacted both a recruiter and one of his former

6

colleagues at Tiger Management. He was ultimately connected with Patrick Halligan, who once again offered him a job at Tiger Asia.

In 2007, Scott started at Tiger Asia as a member of the Operations Team. In 2013, Tiger Asia converted into a family office, returned all outside capital, and changed its name to Archegos. Trial Tr. 806:17–18; 812:5–13. During the entirety of the time that Scott worked at Tiger Asia and Archegos, he reported to Patrick Halligan. *See* Trial Tr. 891:10–11.

Working at Archegos was difficult. Mr. Halligan—Scott's direct boss—was irascible, demanding, and would yell at Scott and the other members of the Operations Team. Trial Tr. 1419:25–1420:6; 1421:25–1422:4. Scott considered quitting numerous times. At one point, he even put together a list of "pros and cons" about whether he should leave. The pros included his salary and health insurance. The cons included being yelled at by Mr. Halligan. Trial Tr. 1389:10–20. Moreover, the culture at Archegos was a "culture of service to Mr. Hwang," and Mr. Hwang required utmost loyalty. Trial Tr. 825:14–15. Employees "could not express disagreement with Mr. Hwang" and "were expected to be loyal to his views and his wishes." Trial Tr. 826:5–7. Whenever individuals expressed a different view, Mr. Hwang "rejected any concept of disagreement . . . and put those disagreements down fairly harshly." Trial Tr. 827:11–13. Succinctly put, "the main role of employees at Archegos was to do what Bill told you to do." Trial Tr. 825:18–19.

Despite the difficulties of the job—or at times because of them—Scott kept his head down and did what he was told. As a member of the Operations Team, he worked on accounting, and tax-related and back-office functions for the fund. Trial Tr. 810:16–23; PSR ¶ 167. Among these back-office functions were his responsibilities for creating or maintaining internal reports that tracked measures that were important to more senior employees at Archegos.

For example, Scott was responsible for monitoring the margin rates that Archegos was paying

for securities, *i.e.* the ratio of cash vs. loan that Archegos was required to pay for each security.

Trial Tr. 850:19–851:1. To do this, Scott built complex models that mirrored the margin rules at

each of Archegos's key counterparties. Trial Tr. 850:19–851:1. Scott also monitored capacity

levels at each of Archegos's counterparties, *i.e.* how much buying power Archegos had at each

broker and in each security. Trial Tr. 862:10–19. He also maintained Archegos's ownership test

reports, which provided an accounting of Archegos's equity positions and the ownership

percentage of each of those cash positions, to facilitate monitoring to ensure that Archegos

stayed below the five percent filing threshold in each security. Trial Tr. 842:1–5.

Scott was so skilled in creating these spreadsheets and at calculating numbers that he

became known around the office as the "margin bot"—the guy who, much like an automated

software program, was tasked with running very complicated calculations when more senior

individuals told him to. Trial Tr. 1215:7–14; 842:7.

Although Scott supported Archegos's traders—by creating internal reports, identifying

where they could trade, and booking the trades—Scott had no input on trading strategy. Trial Tr.

1308:21–25; 1256:24–1257:2. Other than cursory Bloomberg instructions, for most of his

employment, Scott had limited interactions with the traders. He wasn't invited to join the regular

Zoom meetings with head trader William Tomita and the other members of the trading team.

Trial Tr. 1213:24–1214:3. And he had even more attenuated contact with Mr. Hwang himself.

Before the pandemic, Mr. Hwang would occasionally visit the Operations Team. When the

pandemic forced all employees to work remotely, Scott's contact with Mr. Hwang became

almost nonexistent. Trial Tr. 1213:19–21. To the extent Mr. Hwang had a directive for Scott or

the Operations Team, the instruction was passed through other individuals, such as Mr. Halligan

and Mr. Tomita.  Trial Tr. 1039:8–12; 1101:18–23.  This is not surprising.  Scott was the "margin bot"—the guy who sat in the back office and ran the numbers.  Trial Tr. 1215:11–14.

In January 2019, Scott was promoted and became Director of Risk Management.  Trial Tr. 816:13–16.  Scott's day-to-day responsibilities did not materially change.  He continued to handle accounting responsibilities, book trades, and prepare internal reports.  Trial Tr. 819:16–18.  However, in addition to those tasks, Scott periodically evaluated certain types of enterprise risks, such as cyber security risk, physical security risk, key-man risk, and others.  Trial Tr. 819:21–24.  Critically, Scott did not oversee or have any responsibility for monitoring the risks in Archegos's trading portfolio, *i.e.* characteristics such as concentration, size of positions, leverage, and scale of borrowing.  Trial Tr. 817:3–12.  Simply stated, Scott had no oversight over Archegos's portfolio risk and no portion of his responsibilities related to portfolio risk.  Trial Tr. 820:5–7; 822:7–8.  Responsibility for managing the riskiness of Archegos's portfolio was left to the sole discretion of Mr. Hwang.  Trial Tr. 817:13–14; 1256:24–1257:1.  After a few months in this role, Scott learned that his responsibilities were vastly different from those typically held by directors of risk management at other funds.  Trial Tr. 817:3–6.

It was in the course of his employment at Archegos that Scott made the biggest mistake of his life.  In approximately 2018, Patrick Halligan decided he wanted to offload his responsibility for handling risk-related phone calls with banks to someone else.  He picked Scott—the office's gentle, hardworking, agreeable "margin bot."  In transitioning this responsibility, Mr. Halligan "trained Becker to lie."  Trial Tr. 5142:24–25 (Gov't Summation).  And Scott did.  *Id*.  It was in the course of these calls that Scott committed the federal crimes for which he has pleaded guilty and is deeply remorseful. These lies are discussed *infra* at 16–21 (offense conduct).  They are the biggest mistake and regret of Scott's life.

**D.  Scott Becomes a Husband and Father, and Builds a Life in Goshen, NY**

At the same time that Scott was building his career at Archegos, Scott's personal life was blossoming.  In 2013, Scott's younger sister Michele invited her roommate Patricia to celebrate the Fourth of July at the Becker family home in Port Jervis, New York.  Over a backyard barbeque, Trish and Scott struck up a conversation that lasted for hours.  Ex. 8 (P. Becker).  They later fell in love.  Ex. 8 (P. Becker).

From their earliest days of dating, Scott proved himself to be thoughtful, considerate, and devoted to Patricia.  "He followed through with what he said" he would do, "plan[ed] activities for [them] to do together," and showed up for Trish in good times and bad.  Ex. 8 (P. Becker). When Trish was involved in a car accident in their early months of dating, Scott dropped what he was doing and rushed to her home to ensure she was okay.  Trish's parents recall this as an early indicator of Scott's "caring and reliable" nature: "[W]e were surprised when suddenly Scott walked in the door.  We didn't expect this because not only was it a weeknight but he lived an hour away.  He wanted to check for himself that she was okay.  This was just one of the ways he proved to us how much he cared for her . . . ."  Ex. 9 (P. and K. Cronin).  Later on, when Trish was awarded tenure as an elementary school teacher, Scott "didn't hesitate to drive two hours after working all day to cheer [her] on during the ceremony."  Ex. 8 (P. Becker).  He was eager to stand by her side and celebrate her professional accomplishments.  Ex. 8 (P. Becker).

After a few years of dating, Scott and Trish decided to get married and buy a home together.  When choosing where to start their family, they were presented with the question of where to live.  On the one hand, they could move to Manhattan, which would be close to Archegos and could offer them the benefits of city living.  One the other hand, they could live in upstate New York, near their families and the school at which Trish had secured tenure as a teacher.  For Scott, who has never pursued an extravagant lifestyle, it was no question at all: they

would live near family and Trish's job. Scott made this choice despite the grueling, nearly four-hour daily commute on public transportation. Ex. 8 (P. Becker). As Trish explains:

> His job in New York City made more money and had better health insurance. One might have thought the clear choice would be for me to find another teaching job close to New York City, but not Scott. He knew choosing to move to Orange County New York would prioritize what was most important to us: family.

Ex. 8 (P. Becker).

This choice, prioritizing family and others over wealth and self-interest, is emblematic of Scott's character. He has never pursued luxury and has eschewed an extravagant lifestyle. As his friend John explains:

> [N]o level of success has changed the core of who Scott is. He has never demonstrated a desire to live a fancy or extravagant lifestyle. He used his success to enjoy time with family and friends, hosting birthday parties and barbecues. When Scott met his wife Trish, he could have easily followed the example of others in similar positions, moving to Manhattan and embracing a higher level of living. Instead, he and Trish decided to remain in upstate New York to be able to be closer to family and friends and continue those relationships.

Ex. 7 (J. Iarocci).

Indeed, Scott used his income at Archegos "not as an opportunity to enrich himself, but rather as a chance to give back." Ex. 7 (J. Iarocci). When he was 29, Scott set up and funded an annual scholarship for a student from his high school interested in pursuing accounting or finance. *See* Ex. 5 (A. Becker). Each year, the high school invited Scott to participate in a scholarship dinner or award presentation, but Scott declined so that he could remain anonymous. *See* Ex. 5 (A. Becker). His decision was "made from a place of wanting to help others, rather than gain recognition for his good deed." Ex. 7 (J. Iarocci). Scott funded this scholarship for five years. He stopped only when the number of applicants dwindled to a halt.

In 2018, Scott and Trish learned that they were expecting a baby. Although Trish's pregnancy proceeded smoothly, the birth was anything but. Ex. 8 (P. Becker). At 37 weeks,

Trish was diagnosed with ██████████████████████████████████████████

██ . She was rushed immediately to the hospital where she was informed that she could not

leave until their son was born. Ex. 8 (P. Becker). Scott "sprung into action, rushing home to

pack [their] suitcases and gather what [they] needed." And "[o]nce he arrived back at the

hospital he remained at [Trish's] side with his calm and steady presence" throughout the difficult

delivery. Trish recalls:

> The initial moment our son was born, however, was not one filled with joy but instead
> panic. ████████████████████████████████████████████
> ██████████████████████████████████ As I lay there
> vulnerable in the hospital bed, Scott stood between me and where the baby was holding
> my hand and helping me breathe. We are forever grateful to the amazing staff at the
> hospital who successfully resuscitated our baby boy in the minutes following his
> birth. . . . Throughout the whole ordeal, Scott was a constant source of strength.

Ex. 8 (P. Becker).

"From preparing [█████'s] bottles, waking for nighttime feedings, and even stepping in

to change the most explosive of diapers," Scott threw himself into caring for █████ while Trish

recovered from the difficult birth. Ex. 8 (P. Becker). Scott "was always there, helping with the

tasks that come with a new baby, and making sure [Trish] was taking care of herself and getting

enough rest. He would change the baby and assist with feedings without hesitation." Ex. 10 (J.

and L. Soudant). He also "cook[ed] for his family" and "[took] care of the home." Ex. 9 (P. and

K. Cronin). As Scott's parents-in-law observed, "[a]fter they got married and started a family it

was even more apparent how caring and reliable he was." Ex. 9 (P. and K. Cronin).

Both Scott and Trish decided to maximize their parental leave so they could bond with

their young son. But Trish received only six weeks of paid leave. With Scott's encouragement,

Trish decided to extend her leave without pay so that she could spend time recovering and

bonding with █████ . Shortly after the onset of the COVID-19 pandemic, just seven months

after ███ was born, their young family once again faced decisions about ███'s care: Trish had to choose whether to proceed with the new school year or resign from her tenured teaching position to care for ███ full-time. Given how much energy she had poured into her career, it was not an easy decision to make. But Trish knew what she wanted in her heart: she decided to resign to be a full-time mom. Ex. 8 (P. Becker). As she recalls:

> Scott never made me feel like the decision was not mine to make. In the discussions we had about how much time to take off or if we could financially do it, he had always said, if commuting into the city and working at his job meant he could support me in one of my dreams it was worth it.

Ex. 8 (P. Becker).

"There is no doubt, [Scott's] top priority is his role as a father." Ex. 8 (P. Becker). As ███ has grown older, Scott has gone from changing bottles to carving jack-o-lanterns, building gingerbread houses, and taking nature walks. Ex. 8 (P. Becker). "When ███ encounters a challenge in school or at home, Scott sits down with him to talk through the problem and helps him find a solution." Ex. 8 (P. Becker). "███ looks up to him in so many ways. He loves to watch Scott as he mows the lawn and it is his favorite when Scott will stop and give him a ride when he is done." Ex. 8 (P. Becker).

Having put fatherhood at the center of his life, Scott's friends are now part of a group of devoted dads. As one friend notes, "an element of our relationship that I could never adequately articulate is the shared sentiment of becoming first time fathers within two months of each other. . . . The bond between Scott and I was not merely one of circumstance but was a source of support that I personally came to rely on in those trying early years as first-time fathers." Ex. 11 (H. and K. Herkenham). Even when moves separate them geographically, Scott has ensured that he keeps in touch through "play dates with our kids" several times a year. Ex. 12 (D. Satter).

As Scott's family grew, he became even more rooted in his family and community. Scott has always loved children and has become a favorite uncle to his nieces and nephews. Ex. 11 (H. and K. Herkenham) ("My children have come to know 'Uncle' Scott as the thoughtful, steady, and loving individual that he is and B███ is not only a 'cousin' to my children, but indeed, one of their first friends."). On pleasant summer days, Scott can be found out on his lawn hooking up sprinklers for the kids, chasing them playfully, and making sure each and every one of them feels included and welcome. Ex. 10 (J. and L. Soudant). Numerous individuals say they would choose Scott to care for their children in a crisis:

- Scott "is the one we'd call on to help watch my kids if we were in crisis and we'd do so knowing our kids were in the company of a smart, caring, respectable and genuinely kind individual." Ex. 13 (M. and E. Hyle).

- "When my mother-in-law passed away and we needed someone to watch our children during the wake, Patricia and Scott stepped in without hesitation and cared for our three kids." Ex. 10 (J. and L. Soudant). Scott's "selfless, kind, and caring nature leaves a lasting impact on everyone he meets. We are grateful to know that we can always count on him, no matter what life throws our way." Ex. 10 (J. and L. Soudant).

- "My husband and I were honored to ask Scott to be our daughter's guardian if anything should happen to us. If needed, I know she will be loved, safe, and have a good responsible role model to look up to because we can see the love and support he gives our daughter, the most precious person in our lives." Ex. 2 (M. Becker-O'Connell).

- "He is a person with whom I would entrust the welfare of my wife and children, a decision that as a husband and father I do not take lightly and the magnitude of which is a testament to Scott's character." Ex. 11 (H. and K. Herkenham).

When his grandfather was in hospice, Scott regularly visited with him despite living over an hour away. *See* Ex. 5 (A. Becker). He wanted to honor the man around whom his siblings would gather to hear advice, life lessons, and stories from his days serving the country in the military. Ex. 1 (J. Becker). Scott is also a respectful and welcoming son-in-law to Patrick and Kathy Cronin. Ex. 9 (P. and K. Cronin). They describe him as attentive to their needs, whether it is offering a bite to eat or adjusting the thermostat. Ex. 9 (P. and K. Cronin). Scott volunteers without hesitation to drive Pat and Kathy to visit family (most of whom are a two-hour drive away) for family celebrations, whether it be family Christmas parties or weddings. Ex. 9 (P. and K. Cronin). And when Pat and Kathy are able to travel themselves, Scott always anticipates their concerns about any difficulties in the journey, carefully and patiently giving directions and making sure they feel comfortable. Ex. 9 (P. and K. Cronin).

Scott's "kindness, loyalty, and [] willingness to help when needed most" also undergirds his friendships. Ex. 13 (M. and E. Hyle). He is known for welcoming others into his home. When Scott's friend Mark underwent ███ surgery, Scott opened his home to his friend Erin so that she could more easily stay by Mark's side during his surgeries. They write: "As Erin stayed with [Mark] in the hospital until as late as she could bear, Scott selflessly stayed up into the early hours of the morning for a week straight to welcome her into his home." Ex. 13 (M. and E. Hyle). Similarly, his friend Daniel Satter writes:

> Scott invited me into his home because he did not want me to be alone for the holidays. His family took me in as one of their own. In hindsight, I realize how special a day that was for me. Having little family growing up, I rarely got to experience large family

gatherings.  Christmas 2012 was one of the few times in my life that I felt like I was part of a bigger family.

Ex. 12 (D. Satter).

As these statements confirm, Scott has upheld the values of family and community instilled in him as a young child.

## III.    The Offense Conduct

### A.    Mr. Halligan Trained Scott to Lie

For years, when a counterparty wanted to schedule a credit call with Archegos—*i.e.* a call during which they seek information about the nature and risk of Archegos's portfolio—they would reach out to Mr. Halligan, Archegos's CFO, and he would handle the call.  Trial Tr. 891:20–25; Trial Tr. 5142:5–8 (Gov't Summation).  During these years, Scott's involvement with credit calls was tangential and administrative: Mr. Halligan would forward the email to Scott, and Scott would "set up a date and time for him to have these calls with counterparties." Trial Tr. 891:21–25.

That changed in approximately 2018, when Mr. Halligan delegated his responsibility for handling credit risk calls to Scott.  PSR ¶ 78; Trial Tr. 5142:9–10 (Gov't Summation).  To facilitate the transition, Mr. Halligan instructed Scott to shadow him during these calls.  Trial Tr. 891:17–19.  Scott would stand behind Mr. Halligan while Mr. Halligan sat at his desk and took credit calls on speakerphone.  Trial Tr. 893:12–15.  It was on these training calls that Scott first learned that Mr. Halligan was lying to counterparties.  Scott observed that when Mr. Halligan was asked the size of Archegos's largest position, Mr. Halligan lied.  Trial Tr. 893:16–18. Rather than providing the correct answer from Archegos's internal spreadsheet—which was open on Mr. Halligan's computer—Mr. Halligan said the largest position was lower: only 35 percent of capital.  Trial Tr. 893:8–18.  Confused, Scott asked Mr. Halligan why he had given the

35 percent figure.  Trial Tr. 893:19–23.  In response, Mr. Halligan told him that he shouldn't tell

counterparties that Archegos's "largest position was any larger than 35 percent, even if it was

higher."  Trial Tr. 893:25–894:2; 907:14–17 ("The Court: In other words, whenever the

concentration in the portfolio exceeded 35 percent and the bank asked, was it your instruction to

answer 35 percent?  The Witness: Yes, it was.").

Scott shadowed Mr. Halligan on approximately five to ten credit calls before he was

given the reins and asked to take over these calls with the banks.  Trial Tr. 895:14–16; 896:8–10.

Scott understood that Mr. Halligan had instructed him "to tell the lies to understate the reality of

Archegos's portfolio situation."  Trial Tr. 897:16–18.  Nevertheless, when he took over, Scott

did as instructed: he lied to the banks.  Trial Tr. 895:24–896:2.  "Going forward, he almost

always told counterparties that the biggest position was 35 percent, and he never said it was

bigger than 35 percent, even when it was.  Halligan trained [Scott] to lie, and [Scott] followed his

training."  Trial Tr. 5142:21–25 (Gov't Summation).

### B.      Scott Lied in Furtherance of Archegos's Trading Strategy

For several years, Scott's calls with brokers were limited to "periodic check-ins" and

"annual due diligence calls that the brokers would hold from time to time."  Trial Tr. 896:11–16;

897:1–2.  But as trading and market volatility increased, the frequency of these calls also

increased.  Trial Tr. 896:21–897:5.

Beginning in 2020, Mr. Hwang started trading at a feverish, never-before-seen pace.

Trial Tr. 832:4.  Before then, Mr. Hwang's trading was fairly intermittent and high-volume

trading was reserved for periods of extreme volatility and disruption in the markets.  Trial Tr.

835:17–23.  From the perspective of the Operations Team, which was responsible for booking

incoming orders from the trading desk, this new trading seemed "[n]onstop" "[a]ll day, every

day". Trial Tr. 832:4. They joked that working at Archegos was like "Groundhog's Day": the "workday was essentially the same over and over every day" and "Archegos was purchasing securities nonstop from the time the market opened to the time it closed." Trial Tr. 889:7–14. For Scott, it was extraordinarily "busy and hectic" all the time. Trial Tr. 832:10.

By mid to late 2020, trading was so aggressive that Archegos's trading capacity at each bank—*i.e.* its ability to purchase additional shares in desired securities—was "being used so quickly that the capacity was running out." Trial Tr. 847:21–24. To satisfy Mr. Hwang's voracious trading appetite, Archegos needed to obtain more trading capacity at the banks. "In response, Hwang directed his subordinates at Archegos to obtain more trading capacity from existing and prospective [c]ounterparties." PSR ¶ 73; *see also* Trial Tr. 849:5–12.

Typically, to get additional capacity, Mr. Tomita was first tasked with reaching out to his contacts to make the official request. Trial Tr. 848:16–19. Then, before the bank would authorize the increase or open the relationship, the bank's credit team would schedule a call with Scott to discuss risk. Scott lied to these banks about the concentration, composition, and liquidity of Archegos's portfolio. For example, in 2021, Archegos sought a capacity increase from UBS. As typical, Mr. Tomita reached out to his contacts at UBS to request the increase. Trial Tr. 991:18–19. Then, UBS dispatched credit officer Bryan Fairbanks to evaluate Archegos's portfolio following conversations with Scott. Trial Tr. 990:3–4; 991:20–22. On March 8, 2021, Scott spoke with Mr. Fairbanks and lied. He informed Mr. Fairbanks that Archegos's largest position size was 35 percent when it was actually 84.2 percent. Trial Tr. 905:24–25. He also said that the largest names in the portfolio were highly liquid names like Amazon, Google, Microsoft, and Apple, that Archegos's positions at UBS were not reflective of the portfolio at other brokers, and that the entirety of the Archegos book could be liquidated in

approximately two weeks. Trial Tr. 998:1–19; 999:10–19; 986:22–24. These were not accurate statements. Mr. Halligan checked in with Scott both before and after this call. Scott reported back: "Nothing unexpected came up. I'm guessing we'll see that capacity increase soon." Trial Tr. 995:5–10; 1001:17–18. Mr. Halligan responded "yay yay." Trial Tr. 1001:17–20.

Shortly thereafter, Scott received an email from another credit officer at UBS asking for more information about the portfolio, particularly its liquidity. Not knowing what to do, Scott reached out to Mr. Halligan for guidance: "Hi Pat. Please see below from UBS. What's the best response here? I think this is too much color to provide. Will is eagerly awaiting this capacity increase, so I don't want to leave it." Trial Tr. 1005:12–20. Mr. Halligan directed Scott to Mr. Tomita who "might have a canned answer he's been given." Trial Tr. 1007:9–11. As instructed, Scott spoke to Mr. Tomita and summarized the call for his boss: "I just spoke to Will. He doesn't give an answer on that and he said not to provide it, so that we aren't backed into a corner." Trial Tr. 1008:17–19. Scott did as instructed. Trial Tr. 1011:9–11.

UBS persisted and sent another request for information. Again, unsure what to do, Scott forwarded the email to both Mr. Halligan and Mr. Tomita. Trial Tr. 1013:8–10. The three of them then had a Zoom call to discuss how to respond. During this call Mr. Tomita proposed that they tell UBS that 50 percent of the portfolio could be liquidated in ten days, the next 25 percent could be liquidated within 20 days, and the entire portfolio could be liquidated within one month. Trial Tr. 991:2–5; 1013:23–1014:5. Although Scott "wasn't a trader" and "didn't fully understand the liquidity figures that he was providing," Scott "didn't see how it was feasibly possible to liquidate the portfolio in the time frame that Will had generated." Trial Tr. 1014:10–19. Although "Scott looked very uncomfortable," he agreed to relay the information. Trial Tr. 3430:19–20 (Tomita). On March 10, 2021, Scott provided UBS with the liquidity figures they

19

had discussed.  UBS then approved Archegos's request for a capacity increase.  Trial Tr. 1027:22–24.

As he did with UBS, Scott made similar misrepresentations to credit officers at Archegos's other counterparties.  Trial Tr. 848:16–24.  He lied because he was "trained and coached" to do so, "[b]ecause that was [his] job," and because at Archegos the expectation was that "you did whatever you could so that Archegos could pursue its trading strategy."  Trial Tr. 863:5–9; 989:3–5; 5172:12–15 (Gov't Summation).  He certainly didn't do it for personal gain.  As the government succinctly explained:

> Without [Scott's] lies, Hwang could not pursue his trading scheme.  He would have had less capacity, higher margin rates, fewer counterparties.  But for Becker, what's in it for him?  What did he get from lying to the banks?  Nothing.  None of the banks were wiring money to his accounts.

Trial Tr. 5143:20–24 (Gov't Summation).

### C.      Archegos Collapses

As the volume of Mr. Hwang's trading increased, so did the size of his trading.  Trial Tr. 836:8–11.  Archegos's capital ballooned to $36 billion and the gross exposure of the fund—the aggregate or total market value of all securities held by the fund—grew to approximately $160 billion.  Trial Tr. 836:19–20; 838:2–10.  As trading continued, Archegos's excess cash began to run low.  Trial Tr. 1064:15–17.

"[O]n March 22, 2021, ViacomCBS announced a secondary stock offering.  When markets reopened on March 23, 2021, VIAC stock began to decline, and with it, the value of Archegos's portfolio."  PSR ¶ 89.  By the morning of March 24, margin calls began to flow in.  "Since Archegos did not have sufficient cash on hand to cover its margin calls, the operations team, with Halligan's assistance, worked to withdraw excess margin from any Counterparty with which Archegos could obtain."  PSR ¶ 92.  Excess margin held by these banks contractually

belonged to Archegos, but banks wanted to know why Archegos was taking the unusual approach of calling back the excess. Again, Scott wasn't truthful: he diminished the enormity of the crisis and on at least one call falsely identified the amount of Archegos's excess cash. PSR ¶ 92.

By the end of the day on March 24, it was clear that Archegos would not be able to meet margin calls the following morning. PSR ¶ 93. During calls that evening and throughout the next day, Archegos's senior team spoke with banks in an effort to forestall or manage an orderly liquidation. PSR ¶ 94. Scott was directed to field questions on separate calls with credit representatives from each bank and "[o]nce again, Becker did as instructed": he lied to multiple banks. Trial Tr. 5153:11–12 (Gov't Summation).

On March 26, 2021, having failed to meet margin calls, Archegos's counterparties began to unwind Archegos's swaps directly and Archegos collapsed. PSR ¶ 95. After its implosion, Scott was offered jobs at Archegos and the Grace and Mercy Foundation, a charity funded by Mr. Hwang and his wife. PSR ¶ 165. Scott declined both. PSR ¶ 165. He was done.

## IV.    Scott Accepts Responsibility and Cooperates

### A.    Scott's Pre-Trial Cooperation

On July 21, 2021, agents from the Federal Bureau of Investigation knocked on Scott's front door in Goshen, NY to execute a search warrant. As soon as they knocked, Scott knew they were there because of his conduct at Archegos. Trial Tr. 1178:8–18. The very next day, Scott met with the government for the first time. During this meeting, he was asked to consider cooperating in the government's investigation into Archegos's collapse. Trial Tr. 1179:23–24. Scott did not hesitate: he agreed to cooperate and by early August was actively proffering with the government. From that moment on, Scott has been completely truthful. In choosing to cooperate, Scott understood that doing so likely spelled the end of his career and would result in

the loss of his New York State Certified Public Accountant license.  But Scott believed that the time had come to accept full responsibility and do his best to rectify the harm he had helped cause.

Prior to meeting with the government, Scott reviewed thousands of documents electronically in preparation for his meetings with prosecutors.  Scott spent several hours a day for weeks reviewing documents, to ensure that he was prepared to tell the government everything he knew as completely and truthfully as possible.

Scott had several proffer sessions with the government.  These sessions were attended by numerous lawyers and investigators from various branches of the federal government, including the U.S. Attorney's Office, the FBI, the SEC, and the CFTC.  In many instances, beyond simply explaining Archegos's internal communications, Scott was able to point the government to emails or other evidence central to the investigation.

Starting at that very first meeting—and consistently over the course of the next three years—Scott took full responsibility for his misconduct.  He transparently told the government that he had lied to banks in service of Archegos's trading strategy.  And he introduced them to Archegos's personnel, culture, and practices.  He alerted prosecutors to trading patterns that he did not understand but had observed in his back-office capacity while booking trades.  He produced and walked prosecutors through hundreds of pages of his contemporaneous handwritten notes.  He explained the calculations contained in Archegos's highly complex internal reporting spreadsheets.  And he highlighted for prosecutors the portions of these spreadsheets that would prove that what he had said to banks were lies.  He poured through countless Bloomberg chats and placed those chats in context with contemporaneous phone conversations, emails, and spreadsheet data.

In total, Scott met with the prosecutors more than 30 times before trial, each time for several hours.  Trial Tr. 1192:6-8.  Throughout all of these meetings, not once did the government need to question Scott's veracity or his commitment to telling the truth.

**B.  Scott Cooperates and Reaches Resolutions with the SEC and CFTC**

At the same time that Scott was cooperating with the criminal authorities, Scott was also cooperating with the SEC and CFTC.  On March 21, 2022, Scott entered into a formal cooperation agreement with the CFTC and on April 27, 2022, he entered into an Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions.  *See* Order, *In the Matter of Scott Becker*, CFTC No. 22–14 (Apr. 27, 2022).  Pursuant to this order, Scott admitted findings, agreed to cease violations of the Commodity Exchange Act, and committed to ongoing cooperation with the CFTC.

On May 4, 2022, Scott entered into a proposed partial consent judgment with the SEC, which the court entered on May 17, 2022.  *SEC v. Hwang, et al.*, No. 22-CV-3402 (JPO) (S.D.N.Y. May 4, 2022), Dkt. Nos. 18, 26.  Perhaps in recognition of Scott's more limited role, and in marked contrast with the partial judgment entered as to the other cooperator in this case, the SEC reserved judgment as to whether Scott should receive a permanent officer or director bar.  *Compare SEC v. Hwang*, Dkt. No. 26 (Judgment as to Scott Becker) *with* Dkt. No. 29 (Judgment as to William Tomika).

**C.  Scott's Trial Testimony**

Scott's years of cooperation culminated in lengthy trial testimony.  Scott was the first cooperating witness the Government called and he testified over five trial days.  Within the first moments of taking the stand, Scott clearly, candidly, and remorsefully acknowledged his own culpability.  Trial Tr. 802:13–20.  He then did for the jurors what he had done for prosecutors

over the prior three years.  He introduced the jury to the key individuals at Archegos.  Trial Tr.

822:11–823:24 (also "in network").  He introduced the jury to key terms and concepts, including

gross exposure, swaps, capacity, margin, NAV, long vs. short securities, and others.  *See* Trial

Tr. 837:25–838:5; 839:23–840:8; 847:14–16; 850:6–14; 860:1–11; 837:13–20.  He painstakingly

walked jurors through critical Archegos spreadsheets.  Trial Tr. 931:7–935:23 (the LP Sheet);

842:1–845:2 (the Ownership Test Report); 900:8–907:23; 971:2–12; 1332:22–1337:22; 1334:6–

1347:3, 931:7–935:23; 962:10–963:5, 1138:3–1139:3, 1224:15–1226:6 (the Combo Sheet).  He

described the culture of the firm.  Trial Tr. 825:14–15.

He also "recounted how this scheme began."  Trial Tr. 5142:5–6 (Gov't Summation).  He

listened to the recorded calls during which he had lied and carefully and transparently identified

the misstatements he had made in service of obtaining capacity.  He then carefully linked his

testimony to contemporaneous emails, Bloomberg chats, and internal reports.

Scott's testimony was an essential component of the government's case, as evidenced by

the frequency with which prosecutors cited it in their principal and rebuttal summations.  Trial

Tr. 5098; 5133; 5135; 5138-54; 5157; 5160; 5162-64; 5171-72; 5305-5310; 5322-5323 (Gov't

Summation) (referencing Scott more than 100 times).  Indeed, it was Scott's testimony, and *de*

*minimis* personal gain, that rendered the defense's theory implausible.

> Is it really plausible that Becker and Tomita each did this on his own, that each man
> independently decided to lie to the banks, and each one now is just blaming his respective
> boss? No. That's not plausible. A huge tell is that these lies mattered greatly to the
> conspiracy, but they didn't matter at all to Becker or Tomita personally.

Trial Tr. 5143:13–19 (Gov't Summation).

### D.  Scott's Efforts to Rebuild His Life

Scott's misconduct and his subsequent acceptance of responsibility have taken an

enormous emotional, personal, and financial toll.

More than four years will have elapsed between the time agents knocked on Scott's door and the date of his sentencing.  Scott has been working with the government for the entirety of that time.  For nearly a full year, Scott was required to preserve the confidentiality of the government's investigation.  For Scott, who has always drawn on family and friends for support, shouldering this burden alone was deeply isolating.  Ex. 8 (P. Becker).  Scott and his wife found that they withdrew from their community "because it would be too difficult to avoid the topic or have to make up answers to simple questions like 'How is work.'"  Ex. 8 (P. Becker).  Unable to seek support, Scott and Trish's feelings of anxiety and isolation deepened.  Ex. 8 (P. Becker). These feelings of anxiety and isolation were exacerbated by the fact that the world was still grappling with the lasting impacts of the Covid-19 pandemic.

The consequences of Scott's misconduct have also fundamentally affected his finances and family structure.  In late 2022, because of the difficulty Scott would face as a convicted felon trying to find a stable job that provided health insurance benefits, and the then-unknown time commitments associated with his cooperation, Scott and Trish made the difficult decision that she would "leave behind [her] dream of being home with E█████ while he was still little and go back to work."  Ex. 8 (P. Becker).  Trish no longer had the benefit of her hard-earned tenure, but she found another teaching job and resumed work in January 2023.  Ex. 8 (P. Becker).  She and Scott thus switched roles, with her becoming the breadwinner and Scott the stay-at-home parent. Ex. 8 (P. Becker).

With Trish back at work teaching, Scott has become E████'s primary caregiver.  During the week, Scott's mornings are spent making sure E████'s book bag is packed and E████ is safely dropped off at school or the bus stop.  Ex. 8 (P. Becker).  When E████ was in half-day preschool, they spent every afternoon together.  Ex. 8 (P. Becker).  Now that E████ is older,

Scott's afternoons are spent collecting his son from the bus, taking him to his gymnastics class, talking him through challenges encountered during the day, or watching him play on the playset Scott built in their backyard. Ex. 8 (P. Becker). In the evenings after dinner, they toss a baseball to each other or kick a soccer ball around. Ex. 8 (P. Becker).

"As a dad he looks forward to the times when he can participate in our son's school events and activities." Ex. 8 (P. Becker). Scott has taken particular joy in ████'s t-ball practices with the local little league, an activity Scott did with his own father growing up. At first, ████, ████████████████████████████████████████ was ████████████ unable to join the other kids on the field. Scott, seeing his son in crisis, remained calm and supportive while ████ worked through his feelings. Ex. 8 (P. Becker). For the next few practices, Scott stood by ████'s side, both in the dugout and out on the field. "Scott's involvement on the field helped [████] become comfortable and before we knew it he was making friends and playing the game." Ex. 8 (P. Becker). The only times Scott missed a t-ball practice or game was when he was meeting with the government in connection with his cooperation. Ex. 8 (P. Becker).

Compounding his lack of employment, after Scott's plea was made public, Scott and Trish received "letter after letter" from financial institutions closing accounts held in Scott's name. Ex. 8 (P. Becker). Scott and Trish's joint checking account was closed, Scott's only credit card was terminated, and even an account that Scott and Trish had established in ████'s name, with a balance of only a few hundred dollars, was redeemed. This last closure in particular "tore Scott apart." Ex. 8 (P. Becker).

These account closures exacerbated the financial losses that Scott experienced when Archegos collapsed. Like many employees, a significant portion of Scott's wealth was held in

Archegos's deferred compensation/bonus plans. Between 2016 and 2020, Archegos offered employees a mandatory deferred compensation plan pursuant to which a certain portion of an employee's bonus (between 15% and 25% depending on the year) would be deferred and earn credit as though the money were invested in Archegos Fund LP (the "Fund"). Starting in 2018, Archegos offered certain employees, including Scott, an elective deferred compensation plan pursuant to which they were allowed to defer more of their total bonus award (between 25% and 35% depending on the year). Employees, including Scott, felt enormous pressure to contribute to these plans. *See, e.g.*, Dec. 19, 2024 Hwang Sentencing Hr. Tr. 6:16–22 (The Court) ("The government has reminded me of a good deal of the testimony about the climate in Archegos, the requirement of employees to declare how much they would be putting into deferred compensation before Mr. Hwang told them what bonuses they would get and the distinct feeling they had that if they were not cooperative with Mr. Hwang they would suffer in their employment.").

When the Fund collapsed, deferred compensation collapsed, too. *See, e.g.*, Trial Tr. 560:25–561:3 (Jones); Trial Tr. 423:25–424:10 (Martz). Scott contributed over $1.1 million in bonus compensation pursuant to the terms of these mandatory and elective deferred compensation plans. At its peak, the estimated value of Scott's deferred compensation was north of $14 million. Now it is zero. Because of his wrongdoing, Scott is not seeking restitution pursuant to the court's January 8, 2025 Supplemental Restitution Schedule. PSR ¶ 163.

The last four years of extreme stress have coincided with Scott and Trish's efforts to grow their family. As Trish explains:



gain, his caring and dependable presence
was a refuge I took comfort in. I knew that he was by my side and we would get through
it together.

Ex. 8 (P. Becker).

Scott and Trish have recently found joy: They are expecting another child in September

2025. PSR ¶ 142. Given Trish's age and ███████████████████, her pregnancy

has been deemed high risk by her doctors, and Scott's support is needed now more than ever.

Determined to move forward with his life for himself, his wife, and his growing family,

Scott has become a certified personal trainer through the National Academy of Sports Medicine

and has three proud "clients": his brother, his wife, and his son. Ex. 8 (P. Becker). Since 2022,

Scott has been volunteering with Habitat for Humanity, where he has devoted more than 300

hours building homes, demonstrated his "commitment [and] work ethic," and become a

"valuable member of [their] volunteer team, contributing [] extensive knowledge and skills." Ex.

14 (J. Rivera); Ex. 8 (P. Becker). As the site specialist notes, Scott "approaches every task, no

matter how big or small, with 100% effort and determination. . . . His dedication is unmatched,

and he is always one of the first to step forward when a volunteer opportunity arises."  Ex. 14 (J. Rivera).  He is known to be a "person of integrity and kindness" who has a "welcoming, approachable nature and makes a conscious effort to make others feel comfortable and included, especially those who may be new to volunteering or working with Habitat for Humanity."  Ex. 14 (J. Rivera).  "His impact goes far beyond his hours of service; he has helped create a culture of hard work, respect, and support that benefits everyone involved with our organization."  Ex. 14 (J. Rivera).  Scott proudly speaks with his son about his work with Habitat for Humanity and E███ understands that his father is "helping build houses for people who need help."  *See* Ex. 5 (A. Becker).

## V.  The Sentencing Guidelines and the Probation and Pretrial Services Office's Recommendation

In determining an appropriate sentence, the Court should consider the factors set forth in 18 U.S.C. § 3553(a), including: "the nature and circumstances of the offense and the history and characteristics of the defendant"; the need for the sentence to "reflect the seriousness of the offense, [] promote respect for the law, [] provide just punishment for the offense," and protect the public from potential recidivism; "the kinds of sentences available"; and the "need to avoid unwarranted sentence disparities."  18 U.S.C. § 3553(a).

Where, as here, the government is expected to move for the defendant to be sentenced as a cooperating witness, the Court should also consider the non-exhaustive list of factors set forth in § 5K1.1 of the U.S. Sentencing Guidelines:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
(3) the nature and extent of the defendant's assistance;
(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
(5) the timeliness of the defendant's assistance.

U.S. Sent'g Guidelines Manual (U.S.S.G.) § 5K1.1(a).

Notably, the U.S. Probation and Pretrial Services' Presentence Investigation Report recommends a sentence of time served pursuant to Section 5K.1.1. PSR at 52, 53. The PSR recommends that "a variance below the defendant's applicable guideline range of imprisonment is warranted" for the following reasons:

> Becker is a first-time offender who committed a non-violent offense starting at age 37. Without diminishing the defendant's own criminal conduct, the offense conduct was initiated, facilitated, and driven by Hwang. The defendant is a college graduate who had a steady employment history in the financial industry. Becker has a strong support network consisting of his wife, their six-year-old son, and his family members. The defendant's wife is also expecting their second child in mid-September 2025. Becker has a stable residence, and he has no history of substance abuse or mental illness, with the exception of receiving counseling since October 2024 to address stress related to the instant case. Thus, based on all of the aforementioned factors, the probation office believes a sentence below the defendant's applicable sentencing guideline range of imprisonment would be sufficient, but not greater than necessary, to comply with the factors set forth in 18 U.S.C. 3553(a).

PSR at 51.

The probation office's recommendation of a non-custodial sentence was also based on information provided by the government, which recognized Scott's "substantial assistance and cooperation":

> Additionally the Government has provided information regarding the defendant's substantial assistance and cooperation in the investigation and prosecution of others, including co-conspirators Sung Kook Hwang and Patrick Halligan. Becker immediately expressed his willingness to cooperate following the execution of a search warrant at his residence in July 2021. The defendant met with the Government several times prior to being charged, providing truthful information concerning his own criminal conduct. Becker met with the Government numerous times thereafter to provide information regarding Archegos' operations and the involvement of Hwang and Halligan, and to prepare to testify at trial. Becker testified for a week at the trials of Hwang and Halligan, which ultimately led to guilty verdicts for both. The Government indicated that the information and testimony provided by Becker was very important in convicting Hwang and Halligan.

PSR at 52. The PSR stated that a sentence of time served was "reasonable" and "would address the sentencing objective of rehabilitation." *Id.* The PSR also recommended three years' supervised release on each count, to run concurrently. *Id.* Lastly, the PSR recommended that no fine be assessed. *Id.*

We respectfully submit that a non-custodial sentence would be sufficient but not greater than necessary to achieve all relevant sentencing goals.

## VI.    A Non-Custodial Sentence is Sufficient to Comply with Section 3553(a)

Scott is a profoundly remorseful first-time offender who poses no risk of recidivism. His cooperation with the government was immediate, and he devoted countless hours to explaining the inner workings of Archegos to criminal and regulatory authorities. He did not benefit from the Archegos enterprise and has never spent money earned while working there in service of a lavish lifestyle. He has complied with all conditions of release and has continued to live a quiet and stable life in the town in which he was born. He is a devoted husband, father, uncle, son, and friend.

We respectfully submit that a custodial sentence would disrupt his family, leave his son without his stay-at-home parent, require his wife to give birth on her own, create unwarranted sentencing disparities between Scott and other similarly situated cooperating witnesses, risk deterring future cooperation, and be greater than necessary to satisfy the statutory sentencing purposes.

Each of the § 5K1.1 factors demonstrates why Scott's cooperation warrants a substantial downward variance. The nature and extent of Scott's assistance is extraordinary. *See* U.S.S.G. § 5K1.1(a)(3). Scott cooperated over the course of numerous years, meticulously reviewed documents and evidence, and offered highly technical assistance to prosecutors whenever asked. At trial, he walked the jury through his lies without excusing or diminishing what he had done.

The only time Scott became emotional on the stand was when he described thanking federal agents for their professionalism after they allowed Scott's wife to take █████ upstairs so that he did not have to witness the FBI's search.  Trial Tr. 1178:22–1179:13.

Scott's cooperation was eminently timely, truthful, complete, and reliable.  *See* U.S.S.G. §§ 5K1.1(a)(2), (5); *see also* PSR at 52 ("[T]he Government has provided information regarding the defendant's substantial assistance and cooperation in the investigation and prosecution of others.").  The government repeatedly directed jurors to Scott's honest, transparent testimony: events occurred "just like Becker said" "and that's because Becker was telling the truth."  Trial Tr. 5145:17–22; 5147:25–5148:1 (Gov't Summation); Trial Tr. 5154:8–9 (Gov't Summation) ("Becker has admitted that all of these things were lies, and the documents confirm it.").

Scott's cooperation was essential to the case.  *See* U.S.S.G. § 5K1.1(a)(1).  The government relied on Scott as an insider and guide who explained market terms, complex calculations, and the culture at the firm.  As evidenced by the frequency with which the government cited Scott's testimony in its summation, Scott's testimony played an important role in securing Mr. Halligan and Mr. Hwang's convictions.  Trial Tr. 5098; 5133; 5135; 5138-54; 5157; 5160; 5162-64; 5171-72; 5305-5310; 5322-5323 (Gov't Summation) (referencing Scott more than 100 times).

Scott chose to cooperate because he knew he was guilty, and he was ready to do the right thing and move on with his life.  Trial Tr. 1179:25–1180:4.  Not once has he shrunk from his responsibility.  But the stress of the government's investigation and the uncertainties of his cooperation have weighed heavily on Scott.  *See* U.S.S.G. § 5K1.1(a)(4).  Since last fall, Scott has been under the care of therapists who have counseled him regarding his stress associated with this case and diagnosed him with major depressive disorder.  PSR ¶¶ 149–150.

The remaining statutory sentencing factors similarly counsel in favor of significant lenience. As detailed above, Scott is a quiet, humble, and family-oriented individual. He is a first-generation college graduate who has led a quiet life of humility, commitment to family, and service to his community. He has consistently given his time, home, and money to help others. Scott's friends describe him as someone who has exhibited great integrity, kindness, and "deep commitment to family values." Ex. 13 (M. and E. Hyle); *see also* Ex. 10 (J. and L. Soudant) ("From the moment he introduced himself, Scott was polite, kind, and caring."). Others say he "is one of the most loyal, kindhearted and giving people I know." Ex. 7 (J. Iarocci). And he is described as not only a "cherished friend" but someone who is "consider[ed] to be like a brother." Ex. 13 (M. and E. Hyle). Scott can always be counted on to help others. His commitment to others is genuine.

Scott's position stands in contrast to his co-defendants. Although Scott "lied to banks to induce them to make loans to Archegos so it could pursue its trading," Trial Tr. 802:19–20, he was not a trader, was not privy to the specifics of his co-conspirator's trading strategy, and indeed was not charged with market manipulation (unlike defendants Hwang and Tomita). Furthermore, a custodial sentence would not account for Scott's more subordinate role in the offense conduct. The trial record makes abundantly clear that Scott engaged in misconduct at the direction of those more senior than himself. He was "trained and coached" to lie, took "his cues directly from Halligan" and "did as instructed." Trial Tr. 5172:13–14, 5162:8–9; 5153:9–12 (Gov't Summation). As the government put succinctly, lying to Archegos's counterparties "was not a role that he took on for himself. This was a job that Patrick Halligan assigned him and it was a job that Bill Hwang knew that he had." Trial Tr. 5138:23–5139:2 (Gov't Summation). The fact that Scott "perform[ed] an essential or indispensable role in the criminal activity is not

33

determinative" of the sentence he should receive. *See* U.S.S.G. § 3B1.2 cmt. n.3(C). More important is that Scott was not an architect, a decision-maker, and did not exercise significant discretion: he did what he was "trained and coached" to do "[b]ecause it was part of [his] job." Trial Tr. 5172:13–14 (Gov't Summation); Trial Tr. 803:13–14.

The government has explicitly recognized in this case that those engaged in back-office duties warrant more lenient sentences than those making the actual trading decisions. Despite Mr. Halligan's conviction after trial, the government agreed to a below-guidelines sentence of eight years—less than half of Mr. Hwang's. Presumably, as Mr. Halligan's subordinate, Scott would have received an even lower sentence than Mr. Halligan had he proceeded to trial.

Finally, sentences received by cooperators in other high-profile white-collar prosecutions underscore the appropriateness of a non-custodial sentence here. For example, in 2015, this Court sentenced three cooperating witnesses in the government's prosecution of Bernie Madoff to noncustodial sentences. *See* Judgment, *United States v. Cotellessa-Pitz*, No. 10 Cr. 228 (LTS) (S.D.N.Y. May 27, 2015), ECF No. 1348 (time-served and 250 hours community service); Judgment, *United States v. Friehling*, No. 09 Cr. 700 (LTS) (S.D.N.Y. June 4, 2015), ECF No. 113 (time-served with 12 months' home detention); Judgment, *United States v. Lipkin*, No. 10 Cr. 228 (LTS) (S.D.N.Y. May 27, 2015), ECF No. 1349 (time-served with 9 months' home detention). Like these defendants, Scott's misconduct is "very serious, indeed," but he has worked "quickly and proactively to begin to right the wrongs caused by his participation" in the fraud. *See* Sentence Hr'g Tr. at 40–41, *United States v. Friehling*, No. 09 Cr. 700 (LTS) (S.D.N.Y. May 28, 2015), ECF No. 114. He similarly lost his savings, is dedicated to supporting his family, and has been exposed to public scrutiny. *Id.*

More recently, two cooperating witnesses in the government's case against Sam Bankman-Fried were also sentenced to non-custodial sentences in recognition of their assistance and quick acceptance of responsibility. *See* Sentence Hr'g Tr. at 16–17, *United States v. Zixiao Wang*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Nov. 20, 2024), ECF No. 544 (finding that cooperator was "entitled to a world of credit for facing up to [his] responsibility and beginning immediately to try to make amends for what had happened," and sentencing him to time served and three years of supervised release); Sentence Hr'g Tr. at 29–30, *United States v. Singh*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Oct. 30, 2024), ECF 536 (noting that cooperator "very quickly, within days of the bankruptcy, told the truth . . . [and] fully unburdened [himself] to the government about the wrongdoing of which [he was] aware," and sentencing him to time served and three years of supervised release).

In addition to these individuals, there are numerous instances in which Southern District of New York courts have recognized that non-custodial sentences are appropriate where, as here, the cooperating witness provided prompt and substantial support to the government, and was not the mastermind of the criminal scheme:

- Sentence of time served and two months of home detention for Thomas Gassnola, who pleaded guilty to conspiracy to commit wire fraud in a NCAA pay-for-play scheme. *See* Sentence Hr'g Tr. at 8:21–9:4, *United States v. Gassnola*, No. 18 Cr. 252 (LAK) (S.D.N.Y. Sept. 10, 2019), ECF No. 24.

- Sentence of time served for Daniel Tzvetkoff, who cooperated but did not testify in prosecution of international online gaming providers. *See* Sentence Hr'g Tr. at 4:13–17, *United States v. Tzvetkoff*, No. 10 Cr. 336 (LAK) (S.D.N.Y. June 4, 2014), ECF No. 280.

- Sentence of time served for Anil Kumar, a cooperating witness in the insider trading prosecutions of Raj Rajaratnam and Rajat Gupta. *See* Judgment, *United States v. Kumar*, No. 10 Cr. 13-01 (DC) (S.D.N.Y. July 2, 2012), ECF No. 50.

- Sentence of time served for a cooperating COO who pleaded guilty to securities fraud. *See* Sentence Hr'g Tr. at 18:21–24, *United States v. Horowitz*, No. 19 Cr. 861 (ER) (S.D.N.Y. Nov. 16, 2023), ECF No. 45.

- Sentence of time served and one year of home detention for a cooperating CFO who pleaded guilty to securities and wire fraud offenses. *See* Sentence Hr'g Tr. at 21:20–22:7, *United States v. Eric Rohr*, No. 19 Cr. 595 (RA) (S.D.N.Y. May 11, 2023), ECF No. 24.

- Sentence of time served for a cooperating defendant who pleaded guilty to securities fraud offenses related to his involvement in an insider trading scheme. *See* Sentence Hr'g Tr. at 8:15–9:1, *United States v. Fogel*, No. 17 Cr. 308 (LAK) (S.D.N.Y. Nov. 27, 2018), ECF No. 83.

As courts in the Southern District have recognized, "sentence[s] that discourage[] others" from cooperation should be avoided. *Singh*, Sentencing Hr'g Tr. at 29:23–30:2; *see also* Sentence Hr'g Tr. at 5:5–6, *United States v. Glass*, No. 07 Cr. 159 (LAK) (S.D.N.Y. Dec. 8, 2008), ECF No. 19 (noting that cooperation agreements "serve[] a utilitarian purpose without which other people couldn't have been brought to justice"); *Horowitz*, Sentence Hr'g Tr. at 20:6–10 ("I think that the public at large would take some comfort in the fact that those individuals who cooperate with the government and try to do the right thing notwithstanding mistakes that they have made are able to benefit from leniency."). This case has been highly publicized. If Scott receives a custodial sentence, it may discourage other similarly situated individuals from cooperating with government prosecutions.

## VII. Conclusion

For the foregoing reasons, we respectfully request that the Court impose a non-custodial sentence.

Dated: August 18, 2025

New York, New York

**COHEN & GRESSER LLP**

/s/ *Jason Brown*
Jason Brown
Randall W. Bryer
jbrown@cohengresser.com
800 Third Avenue
New York, NY 10022
Phone: (212) 957-7600
Fax: (212) 957-4514

*Attorneys for Defendant Scott Becker*